UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LENELL ROBINSON,

        Petitioner,         **REPORT AND RECOMMENDATION**
                                                    **No. 05-CV-6199(DGL)(VEB)**

    -vs-

DALE ARTUS, Superintendent,

        Respondent.
_____

## I. Introduction

Petitioner Lenell Robinson ("Robinson" or "petitioner") has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 1999 conviction in New York State Supreme Court (Monroe County) on one count of second degree (depraved indifference) murder and one count of third degree criminal possession of a weapon. This matter has been referred to the undersigned for the issuance of a Report and Recommendation regarding the disposition of Robinson's petition. For the reasons set forth below, I recommend that the petition be dismissed.

## II. Factual Background and Procedural History

Robinson was indicted and charged with the fatal shooting of twenty-three-year-old Corey Thomas ("Thomas" or "the victim") which occurred at about 2 a.m. on December 20, 1997, outside 113 Lewis Street in the City of Rochester. Thomas died from a gunshot wound to the chest; the bullet hit several of the victim's organs and passed through the heart. T.300-04.[1]

---

[1] Citations to "T.__" refer to the trial transcript.

Twenty-year-old Corey Broomfield ("Broomfield") testified under subpoena for the prosecution that he was "good friends" with Robinson and that they had been were raised together. T.308-09. Broomfield also had known the victim and had been good friends with him as well. T.309. According to Broomfield, Robinson and the victim were friends and associated with each other "all the time." T.309-10. When asked what activities Robinson and Thomas did together, Broomfield stated that used to "[d]rink, smoke weed" together, go to parties and to the movies, and spent holidays with each other's families. T.345-47.

On the night of the shooting, the three had been at a party hosted by Charmeka Swan ("Swan") for Broomfield's cousin, Rodney Crowley. There were about 50 to 60 people at the party. Robinson was in charge of playing music on the stereo. T.311-12. The police came by twice to tell people to turn down the music or break it up because the party was too loud. T.313. Broomfield observed petitioner and victim together that night; they were talking "[l]ike friends", playing music, and taking pictures. T.313-14.

At the end of the party, Broomfield observed Robinson and Thomas get into an argument over a cassette tape. T.314. According to Broomfield, Thomas was looking for a cassette tape but could not find it. He and Robinson "[s]tart arguing" and "[t]hen Nel [petitioner] gave him the tape back." T.316. Broomfield testified that he told Robinson to come outside and help him with the speakers in order to defuse the situation. T.316, 330. Broomfield stated that he did not hear Robinson or Thomas threaten each other in any way. T.316. On cross-examination, he testified that he did hear Thomas saying, "that little .25 is not going to hurt me." T.330.

Once outside with Robinson, Broomfield put the speaker into his brother's car. While he was doing that, he "heard a shot[,] . . . [l]ooked up, seen [sic] Corey Thomas running in the

house." T.318. Broomfield ran in after him and Broomfield called for an ambulance. T.318.

While the emergency medical personnel were attending to Thomas, Broomfield heard another shot, and Kentivas Robinson[2] came into the house with a gunshot wound. T.320-21.

Broomfield testified that he did not see where Robinson went at the time that he heard the first shot, and that he did not see him again that evening. T.321. Broomfield related that he did not see Thomas, the victim, with any type of weapon that night. He did not hear him threaten petitioner or anyone else with a gun or other type of weapon. T.321-22. Broomfield stated that the victim did not threaten to kill or do serious physical injury to anyone. T.322. Broomfield testified that petitioner and the victim "hung around together . . . most of the time" and got into arguments "every day". T.322.

On cross-examination, Broomfield testified that Thomas was bigger and more muscular than petitioner. T.324. Broomfield never witnessed a fight between them. T.324. Broomfield testified regarding his statement to the police in which he described the argument between Robinson and Thomas; Thomas was "saying shit to Lenell and the argument got bigger." T.328. According to Broomfield's statement, Thomas called petitioner a "[b]itch ass nigger, punk faggot, so on, so forth." T.328-29. Broomfield testified that he had heard Thomas speak like that to Robinson "all the time." T.329. Broomfield stated on re-direct that Robinson was calling Thomas names as well. T.344.

Broomfield admitted that while he was putting the speaker into the car, he heard Thomas come "charging" out of the house, still "yelling" at Robinson. T.333. As Broomfield was loading the speaker into the trunk, he heard the shot. T.334. By "charging", Broomfield meant

---

[2] Kentivas Robinson was later found dead and his death was determined to be a homicide. He is no relation to petitioner. His murder was not related in anyway to the shooting for which petitioner was convicted.

"[w]alking fast." T.350. He testified that he "really didn't exactly hear what" Thomas was saying before he was shot. T.350.

Defense counsel confronted Broomfield with his grand jury testimony in which he stated that he heard Thomas, on the night of the party, "talking about doing 25". Broomfield stated that he did not know what Thomas meant by "doing 25" although it could have meant "25 years[.]" T.339.

Charmeka Swan ("Swan"), who lived at 113 Lewis Street (where the party was held), testified for the prosecution that she was friends with Thomas, the victim. T.355. She knew who Robinson was but they were not acquaintances. T.356. She knew Thomas and Robinson to be friends. T.356.

At about 2 a.m. on the night of the party, Swan heard an argument between Robinson and Thomas over a cassette tape. T.362-63. "Mostly they were just cussing at each other, and going on and on about the tape." T.363. Thomas was upset because Robinson did not give him the tape back right away even though he knew Thomas was looking for it. T.363. Robinson replied that now Thomas knew how he felt; apparently there had been an earlier issue about another cassette tape. T.363. Swan related that both petitioner and the victim were "cursing" at each other, calling each other "bitch ass niggers and punk this, punk motherfucker that. . . ." T.364. Swan testified that they did not have any kind of physical contact and that neither of them displayed or made reference to a weapon. Swan stated that neither of them threatened to harm the other. T.364, 370. Swan testified that Thomas was still upset about the tape, and Broomfield's brother took him aside to calm him down. T.365. Robinson and Broomfield then left the house with the speakers. T.365. Swan saw Thomas walk outside the house; she then heard a gunshot and Thomas "came

busting in the door" and told her that he had been shot. T.366.

Investigator Robert Siersma ("Inv. Siersma") testified that he interviewed Robinson regarding the incident and that Robinson waived his rights under *Miranda* and gave a written statement. T.398-400. The statement read, in relevant part, as follows:

> I am Lenell Robinson, and I am 23 years old. I live at 91 Evergreen Street with my mother. I attend MCC and am working towards an A.S. degree. I have this friend named Corey Thomas that I have known since I was eleven years old. We have [a] mutual friend named Robert Broomfield that we hang around with. Over the years Corey and I have had argumental [sic] conflicts over different issues. Corey is the type of person who likes to pick on other people, but he does not like to be picked on. He tends to want to fight with people who pick on him or insult him.
> I had one problem with Corey back in the summer of 1996. We got into a conflict over some marijuana. He argued with me and that led to him sucker punching me in the face. It hurt quite a bit when he punched me. Corey was much stronger than I was, and I knew I could not defend myself with him.
> I left the scene of the altercation and returned a short time later. When I returned Corey had a gun in his hand and said, "what's up bitch? What are you going to do? Have you got your tool, because I got mine?"
> I was scared so I left the area where he was. I continued to have arguments with Corey over the next year and a half, and I would either walk away from him or someone would intervene so that no one would get hurt.
> I had an argument with Corey over my girlfriend on December 16th, 1997, at about 3:00 p.m. while I was in Robert Broomfield's car. Corey was saying things about my girlfriend and I said, "well, what about yours," and he said not to talk about his girlfriend and he called me a motherfucker and he would kick my ass. The only reason he stopped was because I got out of the car. That incident might have led to a fight.
> On December 19th, 1997, I was a DJ for a birthday party for Rodney Crowley at 113 Lewis Street. Robert Broomfield and Nicomis Scott made the arrangements with the lady who lived at the house, and paid her to have the party there. I got to the house at about 7:30 pm. and set up the stereo equipment. The party started at 9:00 p.m. and there was about fifty to one hundred people who came to the party. Corey was at the party and he was coming and going throughout the night. He was drinking, and he was not sober. He was kind of tipsy. We had no problems and I even let him talk on my microphone while the music was playing.
> Later in the night a fight broke out between a kid named Rage and Kiss over some money, and Rodney stepped in to help Kiss. Some of the dudes at the party threw Rage out of the party, and Kiss and Rodney went into the house and chilled out. The police came at one point and asked if there was a problem. That is when this

guy I know named James came up to me and handed me a small chrome handgun, and asked me to hold it for him. He was going outside to his car and did not want to have the gun with him because the police were outside. I put the gun in my back pocket of my pants. Most of the people had left the party, and it was about 1:00 a.m. I turned the music off after that and then Corey Broomfield turned it back on.

We listened to the music for a little while longer, and then I started to break the equipment down. Corey Thomas came up to me and asked me for one of his tapes. I had the tape because I was playing the music and had all the tapes together. He started to yell things at me like I was a bitch ass nigger, he was going to kick my ass; he did not care if I had a gun, it would give him a passion mark, and that he should beat my ass right now.

At that point Corey Broomfield and I picked up a large speaker and carried it out to the car I was driving. It was parked right out in front of the house. I looked back at the house and saw my girlfriend standing in the driveway of the house and Corey Thomas was yelling at me out the window.

He was saying that I was a sucker, and I was a little bitch. My girlfriend, Cindy Castro told him to chill, and that is when he pushed passed [sic] her and ran towards me. Corey Broomfield and I were in the middle of the street and Corey Thomas ran up on me. He said[,] "what are you going to do now, Bitch," as he was running toward me. I pulled the gun out of my pocket and pointed it at him and pulled the trigger. The gun went off and he grabbed his chest and ran back into the house. I did not have to cock the gun, I only pulled the trigger. Robert came out the door and said, "damn[,] I knew this was going to happen." Robert started yelling for someone to call the fucking ambulance, and his brother Corey ran off and called one.

I wanted to run in the house after Corey to help him but I was scared. I got in the car I was driving, and Cindy came up and said I had shot him. I said, "I know I shot him but I did not mean to." She got in the car and we left. I thought I only shot him in the shoulder, and that he was going to be okay. I did not want him to die.

The next morning my brother called me at my mother's house and told me Corey died, and so did my friend Kentivas Robinson. That really made me feel bad, and I began to cry. I was scared to turn myself into the police because I thought they would blame me for both shootings. I only shot Corey and I fired the gun once. I think it was a .25 or .22 gun because it was small. James came over to my mother's house that morning and took the gun back. He said he was going to get rid of it.

I did not mean to kill him. I did not want him to hurt me again. I am deeply sorry for what happened. I know he had a family and I did not want to take him out of this world.

T.410-14. Inv. Siersma testified that at no point did Robinson indicate that he saw the victim

with a weapon. T.414. Robinson did not tell Inv. Siersma that he felt threatened for his life that evening by Thomas. T.414-15; *see also* T.427-28 (testimony of Investigator Terrance Sheridan). Robinson did not indicate to Inv. Siersma that, on the night of the incident, he heard the victim say the term "do 25" or that he would "do time for him" or "go to jail [for him]". T.421.

Cindy Castro Robinson ("Castro"), petitioner's wife, testified for the defense that she attended the party at 113 Lewis Street and observed the argument between Robinson and Thomas about the cassette tape. T.438-39. She testified that she could tell Thomas was drunk by the tone of his voice and the way he was walking. T.436. Thomas kept saying, "you got my fucking tape, you got my fucking tape" and repeated the epithets that others had heard him call Robinson that night. T.439. Castro testified that Robinson went outside with Broomfield to load the stereo equipment into the car; Castro remained in the living room where Thomas saying "what he'll do to [petitioner], they can take it outside, and that Lenell ain't [sic] nothing but a bitch ass nigger, fuck him, he got his tape, he got his tape." T.440.

At one point, while Robinson was outside and she was in the living room with Thomas, Thomas said, "oh don't care [sic], he'll [Thomas] do 25." T.441. Castro testified that "do 25" was a familiar slang term to her and that it meant "killing somebody" because "[t]hat's what you get after you kill somebody, the sentence." T.444. Castro testified that after comment, Thomas "just kept talking" "junk" for about ten minutes. T.441, 466-67. Castro related that she told Thomas that he needed to "chill out and calm down because they hang together about every day, and they like [sic] brothers; and the reason he was talking like this is because he was drunk." T.441-42. At that point, Castro testified, Thomas went out the front door and ran towards Robinson. T.442. Castro observed Thomas "trying to put his arm [sic] in his pocket like if he

was going to do something." T.442. Then Castro heard a shot, saw Thomas grab his arm, and knew he had been hit. T.442. Castro cried out that Robinson had shot him. T.445. She then went over and got in the car with Robinson, who was crying. T.446.

On cross-examination, Castro testified that all she heard Thomas and Robinson do while they were inside the house was to call each other names. T.469. She observed that the victim was about ten feet away from petitioner when he was shot. T.469. Castro admitted that, when she gave her statement to the police, she did not tell Inv. Siersma that she heard Thomas say anything about "doing 25." T.455-56, 465. Castro denied that Robinson had the gun for quite some time before the party. T.460. Castro testified that Robinson and Castro were "best friends" and "were like brothers" and that she never saw them get into a fist-fight. T.462.

Defense counsel requested a jury instruction on the defense of justification (self-defense) pursuant to New York Penal Law § 35.15 and for the trial court to include the "initial aggressor" language into the instruction. T.479. With regard to lesser included offenses, defense counsel requested manslaughter in the second degree and criminally negligent homicide. T.479. The prosecution opposed neither request. T.480. The trial court determined that it would not charge the requested lesser included offense of criminally negligent homicide but it instructed the jury on second degree manslaughter. T.558. The trial court gave the justification charge but did not include the "initial aggressor" language. T.481, 559-65.

The jury returned a verdict convicting Robinson as charged in the indictment of depraved indifference murder and third degree criminal possession of a weapon. T.578. Prior to sentencing, defense counsel moved, pursuant to New York Criminal Procedure Law § 330, to set

aside the verdict on the ground that it was against the weight of the credible evidence. S.2-3.[3]
This application was denied. S.3. Robinson was adjudicated as a second felony offender, S.4-5, and sentenced to concurrent terms of imprisonment, the longest of which was 22 ½ years to life. S.15.

On direct appeal, the Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction on November 21, 2003. *People v. Robinson*, 1 A.D.3d 1022 (App. Div. 4th Dept. 2003). The New York Court of Appeals denied leave to appeal on February 26, 2004. *People v. Robinson*, 1 N.Y.3d 633 (N.Y. 2004).

In his federal habeas petition, Robinson has asserted the following grounds for habeas relief: (1) the trial court erred in refusing to charge the lesser included offense of criminally negligent homicide; (2) the trial court erred in failing to include the "initial aggressor" language in its jury instruction on the defense of justification; and (3) the verdict on the depraved indifference conviction was against the weight of the evidence. Respondent has asserted the defense of non-exhaustion with regard to Robinson's claims. Respondent concedes that Robinson raised the claims on direct appeal but argues that he did not present them as federal constitutional claims to the state courts and therefore they were not properly exhausted. *See* 28 U.S.C. § 2254(b)(1); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995); *Daye v. Attorney General of New York*, 696 F.2d 186, 192 (2d Cir.1982). In the alternative, respondent argued that the claims are without merit and do not warrant habeas relief.

After respondent filed his answer and opposition memorandum of law, Robinson filed a reply memorandum of law. *See* Docket Nos. 18, 19 & 20. Several months later, Robinson filed a

---

[3] Citations to "S.__" refer to the sentencing transcript.

motion to have his petition stayed "for the purpose of challenging the sufficiency of the evidence regarding his murder conviction in light of the recent jurisprudential shift in the law [in New York] concerning depraved indifference murder." Petitioner's Request for Stay at 1 (Docket No. 21) (citing *People v. Feingold*, 7 N.Y.3d 288 (2006); *Policano v. Herbert*, 7 N.Y.3d 588 (2006)). Thereafter, the case was referred to this Court pursuant to 28 U.S.C. § 636(b)(1). *See* Docket No. 22.

After examining Robinson's request in light of *Rhines v. Weber*, 544 U.S. 275 (2005), and the "relation back" requirement of Fed. R. Civ. P. 15©, the Court denied the motion without prejudice with leave to re-file within 30 days. *See* Docket No. 23. The order instructed Robinson that if he chose to re-file , he was required to file an amended petition and address whether the new insufficiency of the evidence claim "related back" to the original petition under *Mayle v. Felix*, 545 U .S. 644, 656 (2005). The order also instructed Robinson that he was required to address the "good cause" requirement of *Rhines* in his renewed motion for a stay. Finally, the order informed Robinson that it in not way limited his ability to pursue nay state court remedies that might be available to him with regard to his insufficiency of the evidence claim. *See id.*

Over a year has passed, and Robinson has not filed a renewed motion for a stay or a motion to amend the petition; nor has he sought an extension of time to do so. In fact, he has written to the Court inquiring as to when he would receive a decision on his petition and he did not reference the earlier stay motion or the insufficiency of the evidence claim. It is clear by Robinson's inaction that he has abandoned any intention to pursue a stay of his petition from this Court. Accordingly, the operative pleading in the present case is Robinson's original habeas petition (Docket No. 1). The insufficiency of the evidence claim mentioned in Robinson's

request for a stay is not before the Court for consideration because Robinson has not received permission to amend his original petition to include it.

### III. Exhaustion

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that–(A) the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); *see, e.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 843-44, 119 S.Ct. 1728, 1731 (1999); *accord, e.g.*, *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436 (1995)."The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir.1982) (*en banc*), *cert. denied*, 464 U.S. 1048 (1984). This means that the petitioner must have alerted the state appellate court that a federal constitutional claim is at issue. *E.g.*, *Grady v. LeFevre*, 846 F.2d 862, 864 (2d Cir. 1988).

In the past, if a federal habeas petition contained unexhausted claims, federal courts were instructed to dismiss it without prejudice to re-file. *Rose v. Lundy*, 455 U.S. 509, 510 (1982); *accord Bossett*, 41 F.3d at 828. Now, pursuant to the 1996 amendments to the federal habeas statute,[4] district courts have the authority under 28 U.S.C. § 2254(b)(2) to deny on the merits habeas petitions containing unexhausted claims. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In the interest of judicial economy, I have sidestepped the exhaustion hurdle and have examined the merits of Robinson's claims.

---

[4] The Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996).

Because I find that they are either not cognizable on federal habeas review or are without merit, as set forth below, I recommend dismissal of the petition.

## IV. Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2); *see also Williams v. Taylor*, 529 U.S. 362 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *accord Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2d Cir. 2002), *cert. denied*, 540 U.S. 1197 (2004).

## V. Merits of the Petition

**A.     Ground One:          The trial court erred in refusing to charge the lesser included offense of criminally negligent homicide.**

On direct appeal, the Appellate Division rejected Robinson's contention that the trial court's failure to charge the lesser included offense of criminally negligent homicide required reversal of the conviction. The state court found that "[s]ince the court submitted the lesser included offense of second-degree manslaughter but the jury convicted defendant of second-degree murder, the court's refusal to charge the more remote lesser included offense of

criminally negligent homicide cannot be a basis for reversal[.]" *People v. Robinson*, 1 A.D.2d at 1023 (quotation and citations omitted).[5]

This claim is not cognizable in a federal habeas proceeding because it does not implicate a federal constitutional right. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also id.* ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.") (citations omitted). "Neither the Supreme Court[6] nor [the Second] circuit[7] has decided whether the failure to instruct the jury on lesser included offenses in noncapital cases is a constitutional issue that may be considered on a habeas petition." *Knapp v. Leonardo*, 46 F.3d 170, 179 (2d Cir.1995) (citing *Rice v. Hoke*, 846 F.2d 160, 164-65 (2d Cir.1988)); *accord Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir.1996) (*per curiam*).

Because there exists no Supreme Court precedent regarding this question, the Appellate Division's rejection of petitioner's claim cannot have been contrary to, or an unreasonable interpretation of, law established by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). *Accord Kelly v. Greiner*, 97-CV-7535 (JG), 1999 WL 84077, at *5 (E.D.N.Y. Feb. 11, 1999).

---

[5] The rule in New York is that "where a court charges the next lesser included offense of the crime alleged in the indictment, but refuses to charge lesser degrees than that, . . . the defendant's conviction of the crime alleged in the indictment forecloses a challenge to the court's refusal to charge the remote [*i.e.*, of a lower degree] lesser included offenses." *People v. Boettcher,* 69 N.Y.2d 174, 180-81 (N.Y. 1987) (citations and quotation omitted).

[6] *Beck v. Alabama*, 447 U.S. 625, 638 n. 14 (1980) ("We need not and do not decide whether the Due Process Clause would require the giving of such instructions in a noncapital case.").

[7] The Fifth, Ninth, Tenth and Eleventh Circuits have held that failure to instruct the jury regarding lesser included offenses does not present a federal constitutional question and therefore, will not be considered in a federal habeas proceeding. *See*, *e.g.*, *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir.1988); *James v. Reese*, 546 F.2d 325, 327 (9th Cir.1976); *Chavez v. Kerby*, 848 F.2d 1101, 1103 (10th Cir.1988); *Perry v. Smith*, 810 F.2d 1078, 1080 (11th Cir.1987).

Consequently, this Court is precluded from reviewing the issue. *See Jones*, 86 F.3d at 48 ("Since a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule, we hold that *Teague* [*v. Lane*, 489 U.S. 288, 305-08 (1989),] precludes our consideration of the issue."). Therefore, I recommend that Robinson's claim regarding the failure to submit the requested lesser included offense of criminally negligent homicide be dismissed because it fails to state a claim of federal constitutional magnitude.

> **B.  Ground Two: The trial court erred in failing to include the "initial aggressor" language in its jury instruction on the defense of justification.**

On direct appeal, the Appellate Division rejected Robinson's argument that the trial court should have given an "initial aggressor" charge as part of its instruction pursuant to P.L. § 35.15,[8] finding that it was inapplicable because (1) Robinson did not claim that he was the "initial aggressor and attempted to withdraw" and (2) because deadly physical force was used. The Appellate Division noted that when deadly physical force is used, "the analysis of whether defendant was the 'initial aggressor' is relevant only if defendant was in his dwelling at the time of the use of deadly physical force. Here, the shooting took place outside of 113 Lewis Street, not within defendant's home, and thus the initial aggressor provision of Penal Law §

---

[8]  "Penal Law § 35.15(1) provides that 'a person may . . . use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person, unless . . . [t]he actor was the initial aggressor; except that in such case his use of physical force is nevertheless justifiable if he has withdrawn from the encounter and effectively communicated such withdrawal to such other person but the latter persists in continuing the incident'. . . Penal Law § 35.15(1) applies only to the use of non-deadly physical force. The use of deadly physical force is governed by Penal Law § 35.15(2), which provides that '[a] person may not use deadly physical force upon another person under circumstances specified in subdivision one . . . if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating; except that he is under no duty to retreat if he is . . . in his dwelling and not the initial aggressor . . . .'" *People v. Robinson*, 1 A.D.3d at 1023.

35.15(2)(a)(I) does not apply."

As a general matter, challenges like Robinson's, which relate to a defense provided by state law, are not cognizable on habeas review. *E.g.*, *Brown v. Lord*, No. 00 CV 4642(JG), 2003 WL 22670886, at *5 (E.D.N.Y. Oct. 20, 2003) (petitioner's claim that the instructions failed to charge instruct the jury that a withdrawing initial aggressor can recover her right to use deadly physical force and failed to state that petitioner had no duty to retreat in her own home not cognizable on federal habeas review). For an erroneous statement of law in a state-court jury instruction to merit habeas relief, the petitioner must "show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (quoting *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985)); *see also Middleton v. McNeil*, 541 U.S. 433, 437 (2004). The appropriate question on habeas review is whether the allegedly flawed instruction "so infected the entire trial that the resulting conviction violates due process." *Davis*, 270 F.3d at 123 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

Even if this claim could be reviewed on federal habeas review, it must fail because it is without merit given the clear statutory language of Penal Law § 35.15. Thus, Robinson has failed to show that the jury instruction on justification contained an error of New York state law, let alone an error of federal constitutional law. Accordingly, I recommend that this claim be dismissed on the bases that it is not cognizable on federal habeas review and is without merit.

**C.  Ground Three: The verdict was against the weight of the evidence.**

On direct appeal, the Appellate Division denied Robinson's claim that the verdict on the charge of depraved indifference murder was against the weight of the evidence. *People v.*

*Robinson*, 1 A.D.2d at 1023 (citing *People v. Bleakley*, 69 N.Y.2d 490, 495). The Appellate Division held as follows:

> Defendant relied primarily on a justification defense. Although there was evidence presented that defendant was aware that the victim, on occasion, would carry a gun, there was no evidence presented that the victim was armed on the night he was murdered. There was also evidence presented that the victim argued incessantly with defendant over a cassette tape, and that the victim used profanity and pointed his finger at defendant; however, there was additional evidence presented that the verbal barrage never escalated into physical violence. While defendant's wife testified that the victim made a death threat to defendant, she further testified that defendant could not have heard it. Where, as here, witness credibility is of paramount importance, we must give "[g]reat deference . . . to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor" ([*People v. Bleakley*, 69 N.Y.2d at 495]). Determining credibility is primarily a task within the province of the jury (*see People v. Gruttola*, 43 N.Y.2d 116, 400 N.Y.S.2d 788, 371 N.E.2d 506), and its judgment should not be lightly disturbed. Although a different result would not have been unreasonable based on the evidence presented, upon "'weigh[ing] the relative probative force of [the] conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony,'" we conclude that the jury's verdict is not against the weight of the evidence (*Bleakley*, 69 N.Y.2d at 495, 515 N.Y.S.2d 761, 508 N.E.2d 672).

*People v. Robinson*, 1 A.D.3d at 1023.

Robinson's "weight of the evidence" claim derives from New York Criminal Procedure Law ("C.P.L.") § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. Law § 470.15(5). A "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute, whereas a legal sufficiency claim is based on federal due process principles. *People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y. 1987) (weight of the evidence claim is based on court's factual review power; sufficiency of evidence claim based on the law); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (Fourteenth Amendment of the federal constitution requires record

evidence to reasonably support a finding of guilt beyond a reasonable doubt). Accordingly, the Court is precluded from considering the claim on federal habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (habeas corpus review is not available where there is simply an alleged error of state law); *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923).

Because Robinson's weight of the evidence claim implicates only state law, it is not cognizable in this federal habeas proceeding. *Accord Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (dismissing claim that conviction was against the weight of the evidence; such a claim is not a basis for habeas relief but presents only an error of state law, for which habeas review is not available); *Feliz v. Conway*, 378 F. Supp.2d 425, 430 n. 3 (S.D.N.Y. 2005); *Douglas v. Portuondo*, 232 F. Supp.2d 106, 116 (S.D.N.Y. 2002) (same); *Correa v. Duncan*, 172 F. Supp.2d 378, 381 (E.D.N.Y. 2001). Therefore, I recommend that it be dismissed on this basis. *Accord*, *e.g.*, *Correa*, 172 F. Supp.2d at 381.

## VI. Conclusion

For the reasons set forth above, the Court recommends that the petition for a writ of habeas corpus filed by Lenell Robinson be denied. Because the Court finds that Robinson has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court recommends that no Certificate of Appealability should issue with respect to any of Robinson's claims.

/s/ Victor E. Bianchini
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: October 13, 2009
Rochester, New York.

# ORDER

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: October 13, 2009
       Rochester, New York